**UNITED STATES of America,
Appellant,**

v.

**FIDELITY PHILADELPHIA TRUST
CO. et al.**

**No. 71–1277.**

United States Court of Appeals,
Third Circuit.

Argued March 10, 1972.

Decided May 2, 1972.

Issie Jenkins, Department of Justice—
Tax Division, Washington, D. C., for appellant.

Samuel Kagle, Philadelphia, Pa., for appellees.

Before McLAUGHLIN, VAN DUSEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal by the government from an order of the district court, 321 F. Supp. 7, awarding $5,000 to attorney claimants from an escrow fund requires us to decide whether the claimants had perfected an attorney's lien under Pennsylvania law and were, therefore, entitled to priority over a federal tax lien.

The government brought an action in the district court seeking to enforce a 1964 levy on an escrow account in the Fidelity-Philadelphia Trust Company, held in the names of Samuel Kagle and Frank Truscott, Attorneys, for the benefit of O'Brian Buick, Inc., or Carl H. O'Brian and/or Miriam O'Brian, his wife. In 1961, a delegate of the Secretary of the Treasury made an assessment of $116,158.67 for 1947, 1948, and 1949 corporate income taxes against O'Brian Buick, Inc., and in 1963, an assessment of $83,423.89 for 1951, 1952, and 1953 personal income taxes, penalties and interest against the O'Brians.

It was alleged that there was some $22,000.00 in the account. Named with the bank as defendants were Truscott, Kagle and Attorney George D. Kline, because they had asserted a claim to a portion of the funds as attorneys' fees.

The funds on deposit represented proceeds from a 1956 sale of the assets of O'Brian Buick, Inc., whose stock was owned by Carl O'Brian and Jules De-Haan. Because the sellers were in disagreement over the proposed distribution of the proceeds, the purchaser imposed as a condition to the sale the creation of an escrow account in the names of Attorneys Truscott and Kline representing O'Brian, and Attorney Myron Jacoby representing DeHaan. After the account was opened, Kagle succeeded Jacoby as DeHaan's attorney.

In their brief filed in this court, appellees assert:

> The legal services for which claim is made consisted of negotiations with respective clients as to conflicting claims; adjustment of claims of creditors, including accountants; and the preservation of corporate records in a center city office for use by accountants and the respective parties and for the use and benefit of agents of The Internal Revenue Service who were investigating the affairs of O'Brian and DeHaan.

The district court found for the lawyer claimants:

> The answer to the question of when the attorney's lien became choate is not crystal clear. There is no doubt as to the identity of the lienors, nor the identity of the property subject to the lien, but there is no direct evidence on the record which sets a specific date that the $5,000 fee was agreed upon. However, there is considerable testimony which gives a strong indication that an agreement as to this fee was reached in the early stage in the matters which eventually led to these proceedings . . . it is apparent that an agreement had been reached as to the fee to be paid as early as 1956 or 1957. As such, they

have established a choate lien which has priority over the federal tax lien.

> \* \* . \* \* \* \*

> Therefore, a blend of strong evidence that this attorney's lien was choate prior to the attachment of the government's tax lien, together with the equitable principles analogous to the doctrine of unjust enrichment compel this court to rule that the fair and reasonable value of these attorneys' services be paid out of the fund in question.

> The court concludes that the fair and reasonable value of these attorneys' services is $5,000.

■■ When a lien under state law has acquired sufficient substance and has become so perfected as to defeat a later arising or later filed federal tax lien is a matter of federal law. United States v. Pioneer American Ins. Co., 374 U.S. 84, 88, 83 S.Ct. 1651 (1963); United States v. Acri, 348 U.S. 211, 213, 75 S.Ct. 239, 99 L.Ed. 264 (1955). Under federal law a state lien is "perfected in the sense that there is nothing more to be done to have a choate lien—when the identity of the lienor, the property subject to the lien, and the amount of the lien are established." United States v. New Britain, 347 U.S. 81, 84, 74 S.Ct. 367, 369, 98 L.Ed. 520 (1954).

■ A federal tax lien is a perfected, choate lien on the date the lien arises. United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950); United States v. New Britain, *supra*. The lien arises at the time of assessment and continues until the liability is satisfied or becomes unenforceable. 26 U.S.C. § 6322. Here it was uncontroverted that assessment was made on December 1, 1961, on the corporation, on November 9, 1962, on Mr. O'Brian, and on June 14, 1963, on both O'Brians. The priority of a lien created by state law depends upon the time it attached to the property and became choate. Thus, to obtain priority over the federal lien, it became the burden of the attorney claimants to prove (1) they had a lien under Pennsylvania

**774**

law, and (2) that it was perfected prior in time to the 1961, 1962, and 1963 assessments.

## I.

 Pennsylvania recognizes two types of attorneys' liens: a charging lien and a retaining lien. To establish a charging lien "it must appear (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien." Recht v. Urban Redevelopment Authority of Clairton, 402 Pa. 599, 608, 168 A.2d 134, 138–139 (1961).

The record is far from clear as to the precise role played by the attorneys in attending their principals during the negotiations leading up to the sale. Mr. Kline testified:

> We met with Mr. Frankel [the purchaser], and we met with Mr. Jacoby [DeHaan's attorney], and we met with various sales managers of the various Buick agencies, one of which was the Wilkie Buick Agency, but there were two other Buick agencies, the representatives of which were going down there.
>
> As a matter of fact, Mr. O'Brian and I talked to all of them and took them over to the O'Brian Buick place to show them this stuff. It went on like that afternoon after afternoon and evening after evening.
>
> \* \* \* \* \* \*
>
> MR. KAGLE:
>
> Briefly, did you actively participate in the negotiations that led to and culminated in the sale of the various as-

sets which were involved in the De-Haan-O'Brian holdings?

MR. KLINE:

> I did, Mr. Kagle.
>
> \* \* \* \* \* \*
>
> When we were given notices, when Mr. O'Brian was given notice that the franchise had been rescinded by General Motors, then we had to look for customers to buy the assets, meetings with Mr. McLaughlin who represented —Mr. McLaughlin was general manager of the Buick Division in the eastern district and he recommended certain people to us. We had to interview them. We had to take them to Chester. I drove my car to Chester with these various people. They went over the assets, went over the lifts (sic). They went over the—the mechanical aspects of the agency. They took inventories.
>
> I had to stay there at night and took an inventory of the tires, of the different parts of an engine, of a Buick engine, exhausts.
>
> I will never forget there was a question of how many carburetors there were there and they had to be all recounted four times and I had to be there.

 Even if this established the claim of Truscott and Kline, this testimony does not justify the claim of Mr. Kagle who said:

> Well, I do not have any personal knowledge of the status of the parties prior to my advent into this transaction which was sometime in May of 1956, which was after the proceeds were sold and the fund was created.
>
> Prior to my intervention, Myron Jacoby represented Mr. DeHaan.

Because there is nothing in the record to indicate that Mr. Kagle succeeded to Mr. Jacoby's interest, his claim must be predicated upon services performed after the fund was created.

The attorney account was created when the purchaser of the corporate assets insisted as a condition of the sale

that the proceeds be held by respective counsel until conflicting claims of their clients were resolved. The sole purpose of the account was to preserve the fund pending resolution of the conflicting claims of Jules DeHaan and Carl O'Brian.

Assuming that claimants presented sufficient evidence to establish they had created the fund, there is no testimony in the record that there was any agreement between the parties and their clients that they could look to the fund for their fee. As stated in *Recht, supra,* 168 A.2d at 139:

> A further examination of the record fails to disclose any indication, averment, or conclusion that there was any agreement between Attorney Nicklas and Recht that counsel would look to the fund for his compensation. The only statement in the record in that regard is the finding and conclusion of the court below that the fee claimed by Attorney Nicklas for his services was just and reasonable. An agreement to look to the fund for compensation is essential to the recognition of a charging lien and this requirement is not satisfied by a finding of the court that the fee or amount claimed is just and reasonable.

Indeed, there is testimony from claimant Truscott[1] that, at least at one time, they did not look to the fund for payment:

> But since I knew of the overhanging tax claim of the Government, I thought all payments, including the accountants' payment, in order to have a fund as large as I could get to effect a compromise settlement, and *I thought that we should not diminish it by taking our fees,* as the result of which we have not been paid a five-cent piece.
>
> If I had known what the Government would do or has done now, we

would have paid ourselves at the same time as payment was made to Carl O'Brian and DeHaan. But I felt that since there was the overhanging claim, since we were dealing with the Government, since Mr. Kline was actively seeking a compromise settlement, *we should not reduce the fund by taking a fee.* (Emphasis supplied.)

█ One of the prerequisites to establishing a charging lien is an agreement that the attorney will look to the fund rather than to the client for payment. *Recht, supra,* 168 A.2d at 138–139. Here, the only testimony bearing on any indication, averment or conclusion that the claimants looked to the fund for payment is, at best, unpersuasive, and, at worst, militates against them. We find, therefore, that these claimants did not meet the requirements for a valid charging lien under Pennsylvania law.

## II.

█ A retaining lien[2] in Pennsylvania "is dependent upon *possession* by the attorney and binds only money, papers or other property in his hands. Harris Appeal, 323 Pa. 124, 128, 186 A. 92." Silverstein v. Hirst, 376 Pa. 536, 103 A.2d 734 (1954). This principle was reiterated in Cuomo v. Pennsylvania R. R., 157 F.Supp. 358, 359 (W.D.Pa. 1957):

> Under the law of Pennsylvania, the lien of an attorney for the payment of services has been limited to documents or money in their possession belonging to clients in connection with the proceedings in which the services were rendered. In order that the lien might attach it was necessary that the subject-matter should come into actual possession of the attorney. Laplacca v. Philadelphia Rapid Transit Co., 265 Pa. 304, 108 A. 612.

---

1. George D. Kline was asked:

 Q. Now do you subscribe to the statements which have been made by Mr. Truscott as you have read to the Court with respect to his participation

in this transaction involving this fund?
 A. I certainly do.

2. Described as a possessory lien, Restatement, Security § 62(b).

■ The claimants contend that an attorney's account in a bank is tantamount to actual possession, reasoning that although the relationship between the bank and depositor is debtor and creditor, Gartner v. Cassatt, 313 Pa. 491, 169 A. 889 (1933), it is the attorney who is the creditor, not the principal for whom the attorney is agent. Sherts v. Fulton National Bank of Lancaster, 342 Pa. 337, 21 A.2d 18 (1941). However persuasive this argument may be on evaluating the rights of a bank vis-a-vis the agent or principal, it nevertheless fails to meet the nagging problem of actual possession. There exists an essential difference between actual possession and the right to possession. There is no question that bank customers have a right to possession of an amount equal to the funds deposited by them. In this context, funds as reflected by a deposit of currency may be compared to fungible goods. On demand, or in accordance with its regulations, the bank will issue a check or will present currency on the order of its depositor. However, there is nothing in the relationship of the bank and depositor requiring the bank to return the exact specie which was deposited. Furthermore, the reality is that most banking transactions are by check and, insofar as the bank is concerned, "possession" of depositor's funds is merely a computer entry on a bookkeeping ledger.

A comparison is also invited to the common law lien for work done on personalty. It is indispensable that the person claiming such a lien in Pennsylvania have an independent and exclusive possession of the personalty. Fitzgerald v. Elliott, 162 Pa. 118, 29 A. 346 (1894); 5 P.L.E. Possession of Bailed Property § 20, at 90.

We find there was no actual possession of the funds by the attorneys, and, accordingly, hold they did not meet the requirements for a retaining lien.

### III.

■ Even were we satisfied that the minimum requirements of an inchoate retaining or charging lien had been established under Pennsylvania law, there still remains the question of whether it was perfected into the status of a choate lien in order to merit priority under federal law. Although the claimants may have proved two of the three requirements imposed by federal law to legitimate a state lien—identity of the lienor and the property subject to the lien—we are not convinced there was sufficient proof that the precise amount of the lien was established prior to the perfection of the federal tax liens of 1961, 1962, and 1963. Unless the lien was so perfected, it can enjoy no priority.

The district court found that it had become perfected on the basis of Mr. Truscott's testimony that services reflected by this claim had ripened and matured "at the same time as payment was made to Carl O'Brian and DeHaan," apparently in 1956. Clearly, however, this theory runs counter to that advanced by Attorney Kline:

> We had many, many conferences, lot of time spent, as I say, in perpetuating this fund, not only in effectuating it, but in protecting it, and I feel, sir, in view of all these circumstances, that the time spent, the correspondence, letter writing, the checks drawn on the fund to pay immediate expenses, and in settling the claims of the two accountants—namely, Mr. Levin and Mr. Fratkin—who each claimed $5,000, in settling the both claims for $5,000, sir, time and effort went into that, time and effort went into defense of claims of creditors against that fund.

> In view of that and the time spent we feel that the sum of $5,000 is most reasonable as counsel fee for both Mr. Truscott—for Mr. Truscott, Mr. Kagle and myself, sir.

Truscott's approach, adopted by the district court, also runs counter to the basic argument pressed by brief in this court; i. e., that the $5,000 fee represented services for "negotiations with respective clients as to conflicting

claims; adjustment of claims of creditors, including accountants; and the preservation of corporate records in a center city office for use by accountants and the respective parties and for the use and benefit of agents of The Internal Revenue Service who were investigating the affairs of O'Brian and De-Haan." Thus, the theory accepted by the district court, that the fee was for negotiating the sale of the business, cannot be reconciled with the testimony of Kagle and Kline that the fee was based, in part, for services rendered in creating and protecting the fund and settling the claims against it.

In addition to the contradictions inherent in the testimony of the claimants, the procedure employed by the district court in its adjudication is in itself inconsistent with its conclusion that the amount of the fee—the amount of the lien necessary to perfect the claim into a choate state lien—was fixed prior to 1961, 1962, and 1963. At two critical junctures the court disclosed that it was fixing "the fair and reasonable value of these attorneys' services." Indeed, it declared: "The court concludes that the fair and reasonable value of these attorneys' services is $5,000."

 Implicit in the setting by the court in 1971 of "a fair and reasonable value of the services" of the attorney claimants is the unspoken premise that the amount of the fee was not fixed prior thereto. Appellees cannot have it both ways. Either the fee was fixed in amount prior to this time, or it was not. If it was fixed, then there was no necessity for the court to enter into a determination of its reasonableness. The reasonableness of a fee as reflected by the lien is irrelevant to the determination of whether a lien has been established, *Recht, supra,* 168 A.2d at 139. If it became necessary to fix a fee on the strength of claimants' own testimony that this was a reasonable charge for services rendered, then this in itself is evidence that no specific amount for the fee was fixed prior to the district court's adjudication. Moreover, it is inconsistent to say the lien became choate in 1956 or 1957 and in the next breath, referring to equitable principles, declare that the claim was justified in part because the attorneys "expended considerable time in maintaining this fund for a period in excess of eight years."

## IV.

 Remaining for our consideration is an alternate ground utilized by the court in making the award. The court stated that "equitable principles analogous to the doctrine of unjust enrichment compel the court to award them a reasonable attorney's fee for their services in establishing and maintaining the fund." The court found that "the legal services rendered by these attorney-defendants substantially and materially contributed to the creation of this fund. Likewise, they expended considerable time in maintaining this fund for a period in excess of eight years."

The court's reliance on United States v. Hubbell, 323 F.2d 197 (5th Cir. 1963); United States v. Kamieniecki, 261 F.Supp. 683 (D.N.H.1963) and Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) was misplaced.

In *Hubbell,* a federal tax lien had been lodged against a painting subcontractor, who thereafter assigned to his general contractor an unliquidated contract claim he had against a housing authority for extra work performed. The subcontractor testified that although the government knew of his claim, it "pointed out they could not represent me or assist me in any way." The contractor then prosecuted the claim to a successful judgment. The court held that the contractor and its attorneys were entitled an "amount of reimbursement equitably due * * * for creating the fund for the benefit of the government." 323 F. 2d at 201.

In *Kamieniecki,* the attorney prepared a petition for declaratory judgment in a state court and successfully carried it through the New Hampshire Superior Court and then to the New Hampshire

Supreme Court. The Superior Court decreed an attorney's fee in his favor. In the district court proceeding which determined the priority of liens, the court found that although the fee did not qualify as a bona fide lien under state law, the attorney was entitled to a fee approximating that set by the state court, because of his efforts in creating the fund through litigation services describing "this [as] one of those very rare cases where equitable considerations compel the awarding of compensation." 261 F.Supp. at 691.

In *Sprague,* faced with the limited issue of whether a federal court sitting in equity had the power to award attorney's fees as part of costs in a test case, ancillary to other litigation, the Court held that "such allowances are appropriate only in exceptional cases and for dominating reasons of justice." 307 U. S. at 167, 59 S.Ct. at 780.

Through these cases runs a common thread: a fund reduced to judgment as a result of litigation services rendered by the claimant lawyers for the benefit of others. In the case at bar, there was no litigation associated with the creation of the fund. We have searched the record and find no evidence that Truscott or Kline obtained the buyer who ultimately purchased the assets of the corporation. Indeed, their testimony is starkly limited to vague generalizations of accompanying and counseling O'Brian during the negotiations.[3] We perceive a basic distinction between legal services which create or produce a fund by means of litigation and those services which attend a business transaction in which the fund comes into being by the transfer of a client's stock certificates to a buyer in exchange for cash. We express no view on what would have been the effect of testimony indicating that the attorney claimants in fact produced the purchaser for their seller clients. Moreover, extremely significant is the fact that Mr. Kagle, one of the attorney claimants, began his representation after the sale was consummated, and the escrow accounts opened. There is no evidence in the record that he succeeded to the interest of DeHaan's former attorney, Mr. Jacoby.

Finally, always a significant factor in deciding the equities, there is nothing in the record to indicate that the attorney claimants will be, or were, precluded from pressing their claims directly against their clients or the estates thereof. *Recht, supra,* 168 A.2d at 140.

The judgment of the district court will be reversed.

---

3. A sample of the obscure and indistinct nature of this testimony is the examination of one claimant, Mr. Kline. Direct examination by the other claimant, Mr. Kagle:

Q. Now, are you prepared to express a reasonable judgment as to the time in point of hours that was devoted by you personally to the operation of this fund?
A. Yes, I am prepared to tell you.
Q. Approximately how many hours were devoted to it by you, personally?
A. By me, personally? I would say, Mr. Kagle, at least a hundred hours or more, a hundred to two hundred hours. It meant not only meetings during the day, afternoon-afternoon, but it meant meetings at night.
 * * * * *
Cross-examination:
Q. Now, of those 100 to 200 hours you have estimated you have spent, how much of this was before the actual sale? Can you break it down roughly into how much was before the actual sale of the business and how much after?
 * * * * *
A. So I would say that in creating this fund there were—there was over one hundred hours spent in that alone.